IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JASON BURNETT, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:17-CV-779-BH |
| | § | |
| NANCY A. BERRYHILL, ACTING, | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | Consent |

## MEMORANDUM OPINION AND ORDER

By consent of the parties and the order of transfer dated May 5, 2017 (doc. 16), this case has been transferred for the conduct of all further proceedings and the entry of judgment. Before the Court are *Plaintiff's Brief in Support of Claim*, filed July 22, 2017 (doc. 19) and *Defendant's Response Brief*, filed August 22, 2017 (doc. 20). Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is **AFFIRMED**.

### I. BACKGROUND[1]

**A. Procedural History**

Jason Burnett (Plaintiff) seeks judicial review of a final decision by the Acting Commissioner of Social Security (Commissioner) denying his claim for disability insurance benefits (DIB) under Title II of the Social Security Act (Act). (doc. 19 at 1.) On September 10, 2013, Plaintiff filed his application for DIB, alleging disability beginning on March 2, 2006. (R. at 60.) His claim was denied initially on November 7, 2013, and upon reconsideration on April 3, 2014.

---

[1] The background information comes from the transcript of the administrative proceedings, which is designated as "R."

(R. at 86.)  On June 4, 2014, Plaintiff requested a hearing before an Administrative Law Judge (ALJ).  (R. at 90.)  He appeared and testified at a hearing on May 4, 2015.  (R. at 43-59.)  On June 26, 2015, the ALJ issued a decision finding Plaintiff not disabled and denying his claim for benefits. (R. at 11-33.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on August 27, 2015.  (R. at 7.)  The Appeals Council denied his request for review on January 18, 2017, making the ALJ's decision the final decision of the Commissioner.  (R. at 1-3.)  Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g).  (*See* doc. 1.)

**B.      Factual History**

    **1.      Age, Education, and Work Experience**

Plaintiff was born on June 23, 1974, and was 40 years old at the time of the hearing.  (R. at 33, 45, 146, 243.)  He had a high school education and could speak English fluently.  (R. at 46, 149, 151.)  He had past relevant work experience as an insurance adjuster.  (R. at 32.)

    **2.      Medical Evidence**

On March 3, 2006 Plaintiff was in a motor vehicle accident and admitted to Kenner Regional Medical Center.  (R. at 204.)  He had pain in the middle of his back and in his neck that increased with movement.  (R. at 207-08.)  A spinal x-ray showed no evidence of fracture, subluxation, vertebral soft tissue swelling, or acute cervical spine injury.  (R. at 212.)

On April 13, 2006, Plaintiff had a CT scan of his lumbar spine at Touchstone Imaging after complaining of severe low back pain.  (R. at 243.)  The scan showed a mild disc bulge and bilateral facet arthropathy at L4-5, and broad-based central disc protrusion that extended into the ventral epidural fat contacting, but not displacing, the thecal sac and right S1 nerve root at L5-S1.  (R. at

244.)  Both L4-5 and L5-S1 showed mild osteophytic ridging involving the anterior vertebral endplates, but no spinal stenosis or neural foraminal stenosis.  (R. at 244.)

On May 2, 2006, James E. Laughlin, D.O., conducted a clinical examination of Plaintiff's lumbar spine and found he had a decreased range of motion, muscle spasms, and tenderness on palpation over the paravertebral muscles.  (R. at 302.)  A Lasegue's test and Patrick's test were bilaterally negative.  (R. at 302.)  There was no extensor toe weakness, pathological reflex, or neurological or vascular deficit.  (R. at 302.)  His achilles and patellar reflexes were bilaterally active and equal, and he could toe and heel walk.  (R. at 302.)  He had positive straight leg raises and an absence of the left achilles reflex.  (R. at 302.)  Dr. Laughlin recommended epidural steroid injections because Plaintiff had not responded well to conservative care.  (R. at 302.)

Plaintiff received epidural steroid injections on May 31, 2006, June 7, 2006, and June 14, 2006, to treat his back pain.  (R. at 219, 248, 269.)  On May 31, 2006, David Graybill, D.O., noted that an examination of his spine revealed tenderness to palpation of the spinous and paraspinous regions of the lumbar spine with exquisite tenderness over the left S-1 joint.  (R. at 247.)  Plaintiff was able forward flex and touch his toes.  (R. at 247.)  He had increased pain with an Ely's test, with extension and rotation over the lower facets and S-1 joints.  (R. at 247.)  He had difficulty with toe and heel raises with his right foot, straight leg raises produced back pain, and Dr. Grabill noted sensory deficits over S-1 distribution with bilateral affect.  (R. at 247.)

On July 18, 2006, Dr. Laughlin conducted a clinical examination of Plaintiff's lumbar spine, which revealed the same symptoms as his previous examination, except the Lasegue's test was positive on the left.  (R. at 300.)  Dr. Laughlin found that because Plaintiff had not responded to conservative care, including epidural steroid injections, he was a candidate for surgery.  (R. at 300.)

3

On June 20, 2006, Plaintiff had an appointment with Dr. Graybill for a follow-up after his last epidural steroid injection. (R. at 290.) An examination of his spine revealed exquisite tenderness, and there was also tenderness in his lateral lumbar myofascial area and left side paravertebral musculature. (R. at 290.)

On July 25, 2006, Plaintiff met with Richard A. Marks, M.D., P.A., for a second opinion regarding lumbar surgery. (R. at 427.) He reported that since he was in the car accident, he had constant low back pain with relative persistent stabbing-type radiation down the entirety of both lower extremities, all the way down to his toes. (R. at 427.) Sleeping, sitting, and walking were all difficult for him. (R. at 427.) A physical exam showed that sensory L1-S2 dermatomes were normal and equal bilaterally, with the exception of moderate, variable, nonspecifically dermatomal regions of decreased sensation variably in the left leg on some places, and a slight decrease on the dorsum of the right foot. (R. at 427.) The range of motion in his back showed no significant limitation, but there were areas of tenderness and some pain with his range of motion. (R. at 427.)

On November 15, 2006, Plaintiff went to Parkland Hospital (Parkland) complaining of back pain. (R. at 390-91.) He stated that he had sharp pain radiating bilaterally to his knees and toes with numbness and tingling. (R. at 390.) His straight leg raising tests were negative. (R. at 391.)

On January 25, 2007, Plaintiff arrived at Parkland by ambulance, complaining of back pain. (R. at 372, 577.) His pain had increased in the two days prior, with numbness and tingling in his lower extremities that started the prior evening. (R. at 373.) His x-rays showed no changes from before, and he was prescribed pain medication and discharged. (R. at 373-74.)

On January 30, 2007, a discogram showed nonconcordant pain response at L5-S1 and L4-L5, with no pain response at L3-L4. (R. at 379.) L5-S1 exhibited degenerative disc disease with a small

4

posterior central annular fissure and extravasation of contrast into the epidural space. (R. at 380.) The extravasated contrast appeared to outline an apparent extruded disc posterolaterally that compressed the right S1 nerve root. (R. at 380.) L4-L5 exhibited degenerative disc disease with a large disc herniation and extravasation of contrast centrally and posterolaterally to the right. (R. at 380.) There was a posterior radial fissure with subannular bilateral extension that was greater on the left than on the right, and an apparent extruded fragment. (R. at 380.) No significant abnormalities were noted at L3-L4. (R. at 380.)

On February 5, 2007, Plaintiff went to Wolmed Southwest Center Medical (Wolmed) for severe pain in his back and neck that was burning, sharp, and radiating. (R. at 313.) The pain was exacerbated by sitting or moving, and nothing relieved his pain. (R. at 313.) It was also noted that he had a past history of depression and anxiety. (R. at 313.)

On February 22, 2007, an exam of Plaintiff lumbar spine showed mild discogenic degenerative changes present at L4-L5 and L5-S1 with no fracture or subluxation. (R. at 351.)

Plaintiff met with Dr. Marks on March 13, 2007, for severe back pain and possible right lower extremity weakness. (R. at 424.) A physical exam showed decreased sensation to light touch of virtually all dermatomes distal to L3 on the right, and mild hypesthesia in the medial calf and foot on the left. (R. at 424.) He also had diffused low back pain that was not present in his prior examination. (R. at 424.) Dr. Marks ordered an MRI, which showed a right paracentral disc protrusion compressing the S1 nerve root at the L5-S1 level. (R. at 462.) There was a disc bulge at L4-L5 with no focal disc herniation or nerve root compression. (R. at 463.) There was mild to moderate loss of disc space height and disc desiccation at both levels. (R. at 463.)

On June 26, 2007, Plaintiff met with Brent C. Morgan, M.D. (R. at 459, 494.) He had

5

symptoms of mechanical back pain as well as bilateral lumbar radicular irritation. (R. at 459.) He complained of low back pain that radiated down to both legs. (R. at 494.) He had mild weakness of his right S1 distribution compared to left, the remainder of his motor strength was intact, his right ankle reflexes were diminished compared to the left, and his straight leg raising test was negative. (R. at 459.) An MRI showed multilevel degenerative disc disease, and he had right side L5-S1 disc herniation that caused nerve root compression. (R. at 359.) Dr. Morgan determined that it was reasonable for Plaintiff to undergo a microdiscectomy. (R. at 359.)

On July 9, 2007, Plaintiff underwent a microdiscectomy at L5-S1 on the right side. (R. at 446-47, 451.) He tolerated the procedure well and there were no complications. (R. at 447.)

From July 12, 2007 to October 9, 2007, Plaintiff had several follow-up appointments with Dr. Marks. (R. at 417-22.) At the first appointment in July, Plaintiff noted that he had moderate stiffness and pain in his back, but his leg pain was significantly improved, and he had good sensation in both of his lower extremities. (R. at 422.) In August, he reported that although the pain in his back and leg had reduced, some of the pain had returned over the previous two weeks. (R. at 420.) Dr. Marks indicated concern over Plaintiff returning to work as an insurance adjuster because the weakness in his leg or back could cause him to fall from a ladder as he examined a roof. (R. at 420.) In September and October, Plaintiff continued to report pain in his legs and back. (R. at 417-19.) An MRI ordered by Dr. Marks found a bulge at L5-S1, which was later determined to compress or displace the right S1 nerve root, as well as disc desiccation and a bulge at L4-L5. (R. at 444-45 Dr. Marks felt that he could benefit from a fusion at levels L4-L5 and L5-S1. (R. at 417-18.)

Plaintiff went to Wolmed for treatment several times from August 7, 2007 to September 19, 2007. (R. at 315-22, 325-35.) On August 7, 2007, he reported mild pain that was exacerbated by

6

sitting and moving and was placed on a treatment plan to begin physical therapy three times per week. (R. at 315-16.) On August 15, 2007, he reported that he aggravated his back pain lifting a refrigerator. (R. at 317.) Although he experienced moderate to severe pain during this period, his functional ability increased with physical therapy, and he reported that his pain decreased on several occasions. (R. at 317, 319, 321, 325, 329, 333.)

Plaintiff met with Dr. Morgan again on August 7, 2007, August 27, 2007, September 18, 2007, and October 24, 2007. (R. at 443, 450-52.) At the first appointment, Dr. Morgan found that Plaintiff had complete resolution of his radicular complaints but still had a small amount of mechanical pain in his back. (R. at 452.) Overall, he had a "very good recovery" following his surgery and had no further symptoms of nerve root compression. (R. at 452.) Dr. Morgan expected that Plaintiff would be able to consider returning to work over the following two to four weeks. (R. at 452.) At his next appointment, Dr. Morgan noted that Plaintiff had been participating in physical therapy but stated that his right radicular pain had returned. (R. at 451.) In September, Dr. Morgan noted that Plaintiff was doing very well but had some intermittent discomfort of the nerve root. (R. at 450.) In October, Dr. Morgan agreed with Dr. Marks that they should consider a 360 fusion for Plaintiff, but he thought Plaintiff also would need decompression. (R. at 443.)

On November 19, 2007, an EMG nerve conduction velocity study on Plaintiff's left lower extremity revealed evidence of chronic L5 radiculopathy only on the left, with no acute radicular changes. (R. at 772.) The L3, L4, and S1 nerve roots were normal. (R. at 772.)

On December, 17, 2007, Plaintiff underwent a radical discectomy and lumbar fusion at L4-L5 and L5-S1. (R. at 431-32.) He was discharged on December 21, 2007, and was afebrile, with stable vital signs, minimal abdominal pain, moderate back pain, and no leg pain. (R. at 512.)

Following his second back surgery, Plaintiff had follow-up appointments with Dr. Marks from December 28, 2007 to August 21, 2008. (R. at 409-416.) He continually reported that the pain in his back and right leg decreased or abated completely. (R. at 409-416.) He also indicated that he had pain in his left leg, but that pain was caused by protrusion of screws from a prior hip surgery, and once those screws were removed, that pain abated as well. (R. at 411-16.)[2] At the last appointment, he reported that although his back pain had improved, he was still hesitant to do his daily activities and get up from a seated or supine posture. (R. at 409.) An x-ray at that appointment showed excellent appearance on all views. (R. at 409.) Dr. Marks informed Plaintiff that because his back had been fused, the other levels of his back would have to compensate, and he would likely have disc problems in the non-fused areas in the future. (R. at 409.) Dr. Marks also discussed the possibility of screw removal in the future. (R. at 409.)

On January 22, 2008 and March 25, 2008, Dr. Morgan saw Plaintiff and found that he was doing well. (R. at 428-29.) He had no lower extremity weakness or numbness in January. (R. at 429.) His x-rays also showed good alignment of hardware without evidence of fracture or subluxation. (R. at 429.) He had minimal back pain and no radicular leg pain in March. (R. at 428.) Dr. Morgan was "very pleased with his progress at three months out from his surgery." (R. at 428.)

On May 1, 2012, Plaintiff went to Parkland complaining of lower back pain that radiated down his left leg, with new onset of paresthesias in that leg over the past month, and back spasms. (R. at 670.) He also complained of right leg paresthesias. (R. at 670.) He was discharged that same day. (R. at 672.)

---

[2] Plaintiff previously had a percutaneous screw fixation of his left femoral neck fracture in 2005. (R. at 344.) On April 24, 2008, Adam J. Starr, M.D., determined that Plaintiff needed to have the screws from his left hip removed. (R. at 344.) On April 30, 2008, Plaintiff underwent the procedure to have the screws removed. (R. at 404-05.)

8

On October 19, 2012, Plaintiff went to Parkland again complaining of upper and lower back pain with no radiculopathy. (R. at 675.) He had normal range of motion, normal hip adduction, and negative straight leg raises. (R. at 677.)

An x-ray of Plaintiff's spine on March 11, 2013 demonstrated no evidence of a compression fracture and the pedicles were intact. (R. at 708.)

On March 22, 2013, Plaintiff went to the Bluitt Flowers Health Center (BFHC), a clinic of Parkland, for chronic back pain. (R. at 683.) He also reported that he had recently injured his knee while playing with his son. (R. at 683.) He had good pain relief on his medication. (R. at 683.)

On April 14, 2013, Plaintiff underwent an MRI on his spine. (R. at 686.) At L3-L4, there was minimal desiccation and no significant central canal or neural foraminal stenosis. (R. at 686.) At L4-L5 and L5-S1, there was no central canal or neuroforaminal stenosis. (R. at 686.) There was also no evidence of recurrent disc disease or nerve root impingement, but there was edema of his lower lumbosacral paraspinal musculature. (R. at 686.)

On December 4, 2013, Plaintiff arrived at Texas Regional Medical Center by ambulance complaining of mid upper back pain that radiated down both legs, numbness and tingling in both legs, cramps, and pain in the back of both legs that started four days earlier. (R. at 696.) He had severe pain in his back, painful range of motion with all movement, muscle spasms in his right mid and lower back, and bilateral pain with straight leg raises. (R. at 699.) His condition improved, and he was discharged. (R. at 697.)

In late 2014 and early 2015, Plaintiff was still having pain in his back. (R. at 1013, 1071-72, 1083.) In October 2014, he reported working part time, and that he was able to work despite his back difficulties. (R. at 1071.) In January 2015, he reported that working increased his pain. (R.

at 1084.)

### 3. Hearing Testimony

On May 4, 2015, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (R. at 43-59.) Plaintiff was represented by an attorney. (R. at 43.)

#### a. *Plaintiff's Testimony*

Plaintiff testified that he was 40 years old, married, and had five children. (R. at 45-46.) He had a high school education. (R. at 46.) He stated that he had worked since the alleged onset date in 2006. (R. at 46.) At the time of the hearing, he had a part time job earning about $290.00 a month. (R. at 46.) He stated that he could not work full time because of pain. (R. at 47.) He had problems picking things up and concentrating. (R. at 47.) He estimated he could lift about ten pounds but only once. (R. at 48.) At work, he had problems doing computer work because of his memory, and he had problems lifting things at work, so others would assist him. (R. at 48-49.) He had to leave work on multiple occasions, which the company accommodated. (R. at 49.) He stated that he did not think he could work full time, but he would want to if he could. (R. at 52.)

In response to his attorney's questions about his back, Plaintiff responded that he mainly had muscle spasms, and most of the time, it felt like somebody stuck an "ice pick . . . up [his] back and just kind of jiggle[d] it," like something was loose in his back. (R. at 49.) It affected his legs such that he could not stand or walk for long periods. (R. at 49-50.) He could walk about the length of a football field before the middle of his back started hurting, and sit for about 30-45 minutes before changing positions. (R. at 50.) He stated that he was able to play with his two-and-a-half year-old daughter and pick her up sometimes, but it did hurt. (R. at 52-53.) It was hard for him to bend over to put on pants or tie his shoes. (R. at 55.) He did not sit for entire movies or go out much other

10

than to eat. (R. at 55.) He also could only drive about 30 miles before stopping because his feet would fall asleep. (R. at 56.)

Plaintiff testified that his lower back always hurt, but the pain would move up and cause spasms in the middle of his back. (R. at 50.) He also experienced numbness and tingling, as well as pain in his hip and knee. (R. at 50.) Before he was injured, he was able to play with his kids, ride horses, ride four-wheelers, and spend time outdoors. (R. at 55-56.) He stated that after his back surgeries, his back was better for a while, but it was starting to get worse. (R. at 51.) He was still being treated for chronic pain. (R. at 56.)

### b. *VE's testimony*

The ALJ asked the VE if the symptoms Plaintiff described would be a fatal conflict with all the DOT positions. (R. at 56.) The VE responded affirmatively. (R. at 56.) The ALJ then asked if the work Plaintiff was doing was medium work. (R. at 57.) The VE determined that Plaintiff's position as a rental clerk constituted light duty work. (R. at 58.)

## C. **ALJ's Findings**

The ALJ issued his decision denying benefits on June 26, 2015. (R. at 14-33.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the period from his alleged onset date of March 2, 2006, through his date last insured of December 31, 2007. (R. at 16.) At step two, the ALJ found that he had the following severe impairments: osteoarthrosis, degenerative disc disease, depression, and anxiety. (R. at 16.) Despite those impairments, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the social security regulations. (R. at 20.)

Next, the ALJ determined that Plaintiff retained the RFC to perform the following: lift and carry 50 pounds occasionally and 25 pounds frequently; stand 6 hours total in 8 hours; walk 6 hours total in 8 hours; and sit 6 hours total in 8 hours. (R. at 24.) His persistence and pace would be limited to 2-hour intervals of time, and he would need to avoid fact paced, assembly line work. (R. at 24.)

At step four, the ALJ determined that Plaintiff had past relevant work as an insurance adjuster. (R. at 32.) At step five, the ALJ found that although Plaintiff was capable of performing past relevant work, considering his age, education, work experience, and RFC, there were other jobs that existed in significant numbers in the national economy that he could perform. (R. at 32.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, at any time from March 2, 2006, the alleged onset date, through December 31, 2007, the date last insured. (R. at 33.)

## II. ANALYSIS

### A. Legal Standards

#### 1. Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not

reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). The relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are also identical to those governing the determination under a claim for supplemental security income. *See id*. Courts may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id*.

## 2. Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.     Issues for Review**

Plaintiff presents one issue for review:

Whether the ALJ erred by finding Plaintiff's impairment(s) did not meet or equal Listing 1.04.

## C. Listing 1.04

Plaintiff asserts that the ALJ erred when he determined that Plaintiff's impairments did not meet or equal Listing 1.04. (R. at 4-7.)

If a claimant is not working and is found to have a severe impairment at step two that meets the duration requirement, the ALJ must determine at step three whether the claimant's impairment meets or medically equals one of the impairments listed in the regulations.[3] *Compton v. Astrue*, No. 3:09-CV-051513-B-BH, 2009 WL 4884153, at *6 (N.D. Tex. Dec. 16, 2009) (citing 20 C.F.R. § 404.1520). If the claimant's impairment meets or medically equals a listed impairment, the disability inquiry ends, and the claimant is entitled to benefits. 20 C.F.R. § 404.1520(d). The claimant has the burden of proving that his impairment or a combination of impairments meets or medically equals one of the listings. *Id.*; *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990) (per curiam).

To meet a listed impairment, the claimant's medical findings, i.e., symptoms, signs, and laboratory findings, must match all those described in the listing for that impairment. 20 C.F.R. §§ 404.1525(d), 404.1528; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). To equal a listing, the claimant's unlisted impairment must be "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a). The claimant shows that his unlisted impairment or a combination of impairments is "equivalent" to a listed impairment by presenting medical findings equal in severity to all the criteria for the most analogous listed impairment. *Sullivan*, 493 U.S. at 529–31; *see also* 20 C.F.R. § 404.1526(b)(2). The ALJ must consider all of the evidence that is relevant to the claimant's impairments and their effects, but must not consider vocational factors

---

[3] These impairments are listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.

such as age, education, and work experience. 20 C.F.R. § 416.926(c). "[T]he responsibility for deciding medical equivalence rests with the [ALJ]." *Id*. § 416.926(e).

Listing 1.04 provides for presumptive disability for spinal disorders, stating that a claimant will be found disabled if he has:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthrosis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
> B. Spinal arachnoidities, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than every 2 hours; or
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in the inability to ambulate effectively . . . .

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.04. "These physical findings must be determined on the basis of objective observation during the examination and not simply a report of the individual's allegation . . . ." *Id.* § 1.00D. "Observations of the individual during the examination should be reported[,] e.g., how he gets on and off the examination table." *Id.* § 1.00E. "Inability to walk on the heels or toes, to squat, or to arise from a squatting position . . . may be considered evidence of significant motor loss." *Id.*

Plaintiff relies on *Audler v. Astrue*, 501 F.3d 446 (5th Cir. 2007), to assert that the ALJ's analysis was insufficient in determining that his impairment did not meet the requirements of Listing 1.04A. (doc. 19 at 4-5.) In *Audler*, the Fifth Circuit held that the ALJ committed legal error when

16

she "summarily concluded" that the claimant's impairments were not severe enough to meet or medically equal one of the listed impairments, but "did not identify the listed impairment for which [the claimant's] symptoms fail[ed] to qualify," and did not "provide any explanation as to how she reached the conclusion[.]" *Audler*, 501 F.3d at 448. Noting that an ALJ was not "always required to do an exhaustive point-by-point discussion," the *Audler* court stated that it simply could not "tell whether her decision [was] based on substantial evidence" because she "offered nothing to support her conclusion at this step." *Id*. (internal quotation marks omitted) (quoting *Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986)).

Applying *Audler*, courts have found that even when an ALJ specifically identifies a listing at step three, he/she errs by failing to discuss the medical evidence and provide the reasons for the step three determination because the failure prevents meaningful judicial review. *Woods v. Colvin*, No. 3:14-CV-1990-B-BH, 2015 WL 5311142, at *11 (N.D. Tex. Aug. 26, 2015), *adopted by* 2015 WL 5319926 (N.D. Tex. Sept. 10, 2015) (citing cases); *see, e.g.*, *Jones v. Colvin*, No. H–13–1221, 2014 WL 3827819, at *9 (S.D. Tex. July 31, 2014) (concluding that the ALJ erred by failing to discuss evidence or provide reasoning for the step three determination); *Matthews v. Astrue*, No. 11–667–RLB, 2013 WL 5442265, at *4–5 (M.D. La. Sept. 27, 2013) (finding error where the ALJ specifically stated that she considered Listing 1.04A, but did not explain the basis for concluding that the claimant's sensory loss was due to an unrelated problem, and failed to discuss or mention any evidence relating to the remaining 1.04A criteria); *Inge ex rel. D.J.I. v. Astrue*, No. 7:09–CV–95–O, 2010 WL 2473835, at *9 (N.D. Tex. May 13, 2010) (finding that the ALJ erred by not specifically identifying the evidence he relied on for his conclusion at step three), *adopted by* 2010 WL 2473598 (N.D. Tex. June 16, 2010). "Although it is not always necessary that an ALJ

17

provide an exhaustive discussion of the evidence, bare conclusions, without any explanation for the results reached, may make meaningful judicial review of the Commissioner's final decision impossible." *Inge ex rel. D.J.I.*, 2010 WL 2473835, at *9 (citing *Audler*, 501 F.3d at 448).

Here, the ALJ expressly considered and summarized the medical evidence of record in order "to facilitate later review." (R. at 16-20.) In evaluating Plaintiff's allegations of limited functionality, the ALJ considered medical evidence from Plaintiff's treating physicians indicating that he made significant improvements within weeks after his second surgery, and that he was observed to have well-healed surgical incisions and x-rays that showed an "excellent appearance" 11 days after surgery. (R. at 19.) He also noted that although Dr. Marks had concern over Plaintiff returning to work, subsequent records from treating physicians did not indicate he had a poor prognosis or would not be able to work. (R. at 19.) The ALJ noted that although medical evidence from after the date Plaintiff was last insured had shown some worsening pain, he still showed improvement. (R. at 19.)

After summarizing the medical evidence, the ALJ expressly considered Listing 1.04 and found:

> As required by Listing 1.04, the record does not demonstrate that claimant had spinal arachnoiditis or lumbar spinal stenosis with chronic nonradicular pain and weakness and inability to ambulate effectively. The record does not demonstrate that claimant had nerve root compression with neuro-anatomic distribution of pain, limitation of motion of spine, motor loss, and sensory or reflex loss. A CT scan of claimant's lumbar spine found mild disc bulge, broad-based central disc protrusion, and mild osteophytic ridging but no spinal stenosis or neural foraminal stenosis. Though the claimant showed some sensory deficit and positive straight leg raises, the claimant did not consistently show spinal range of motion, motor loss, or inability to ambulate effectively.

(R. at 21 (citations omitted).) Because the ALJ considered the medical evidence and explained his conclusions and determinations at step three, the ALJ did not commit legal error, and substantial

evidence exists to support his decision. *Cf.*, *Woods*, 2015 WL 5311142, at *12 ("The ALJ committed legal error when she failed to discuss any of the Plaintiff's medical evidence and explain how the evidence did not meet the severity criteria of Listing 1.04.") (emphasis added); *Grays v. Colvin*, No. 3:12-CV-00138-B, 2013 WL 1148584, at *11 (N.D. Tex. Mar. 19, 2013) ("The ALJ committed legal error at step three by failing to discuss any of Plaintiff's medical evidence, including the findings and opinions of his treating physicians, as the evidence related to the issue of whether Plaintiff's degenerative disc disease met the severity criteria of Listing 1.04A.") (emphasis added). Remand is therefore not required.[4]

### III. CONCLUSION

The Commissioner's decision is **AFFIRMED**.

**SO ORDERED**, on this 8th day of March, 2018.

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[4] Plaintiff also relies on Social Security Ruling 17-2p to assert that even if his "condition [was] not exact under the [L]isting, the rulings would direct a finding of disability based on medical equivalency when considering 'the preponderance of the evidence.'" (doc. 19 at 6.) As Plaintiff recognizes, however, SSR 17-2p became effective on March 27, 2017. *See* SSR 17-2p, 2017 WL 3928306, at *5. It therefore was not effective when the ALJ issued his decision on June 26, 2015. Even if it were effective, it would not change the determination.